## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Local 28 Sheet Metal Workers, on behalf of itself ) And all others similarly situated, ) | Civil Action No. |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | **CLASS ACTION** |
| ABBOTT LABORATORIES; ) FOURNIER INDUSTRIE ET SANTE; ) and LABORATORIES FOURNIER S.A., ) | **JURY TRIAL DEMAND** |
| ) | |
| Defendants. ) | |

### CLASS ACTION COMPLAINT

Plaintiff, Local 28 Sheet Metal Workers, on behalf of itself and the class of End-payors as defined below, upon personal knowledge as to facts pertaining to itself, and upon information and belief and upon the investigation of their counsel as to all other matters, alleges as follows:

### NATURE OF THE CASE

1.     This is a nationwide class action alleging violations of federal antitrust law and state antitrust and unfair and deceptive trade practices acts arising from the manufacture and marketing of the brand-name drug TriCor, a drug used to control levels of cholesterol and triglycerides in humans. The generic name for TriCor is fenofibrate.

2.     As alleged in greater detail herein, Defendants maintained and extended their monopoly power in the relevant market by executing an overall scheme to delay and disrupt any meaningful generic competition by repeatedly changing the drug's form and strength in non-meaningful ways, and then using those changes to preclude or delay other manufacturers from bringing generic versions of the drug to market. Defendants then took steps to destroy the market for generic versions of the earlier formulations so that there would not be any brand name

drug of the exact same from or strength, thus destroying any market for generic drugs, which must be the bioequivalents of the brand named drugs. Defendants further prevented competition by pursuing baseless patent litigations against any and all possible generic competitors.

3.    By its unlawful acts, Defendants unreasonably restrained, suppressed, and eliminated competition in the market for TriCor and its generic equivalents; and illegally maintained its monopoly in the market for TriCor and its generic equivalents. As a result of Defendants' conduct, Plaintiff and the Class (as defined herein) paid millions of dollars for TriCor at supra-competitive prices that they would have saved had competing and/or generic versions of the drug been available.

4.    In Count I of this Complaint, Plaintiff, on behalf of itself and all others who are End-Payors of TriCor, seek equitable, injunctive and declaratory relief against Defendants based on allegations of monopolization of, and an attempt to monopolize, the market for TriCor and its generic bioequivalents, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

5.    Counts II and III are brought by Plaintiff on behalf of itself and those Class members who purchased or paid for TriCor and its generic bio-equivalents in Arizona, California, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin (the "Indirect Purchaser States"). Counts II and III are brought pursuant to the antitrust and unfair and deceptive trade practices acts of the Indirect Purchaser States.

6.    Count IV is brought by Plaintiff on its own behalf and on behalf of the Class, seeking a constructive trust and disgorgement of the unjust enrichment of Defendants.

-2-

## JURISDICTION AND VENUE

7.     This action is brought under Section 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive and equitable relief to remedy Defendants' violations of the federal antitrust laws, particularly Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 26. In addition, this Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332(d), as amended in 2005, and 28 U.S.C. § 1367.

8.     Venue is proper in this judicial district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) because Defendants transact business, are found, and/or have agents in this district; because a substantial portion of the affected trade and commerce described below has been carried out in this district; because Defendants brought one of the sham litigations which forms an integral part of these claims in this district; and because other related actions are pending in this district.

9.     The illegal monopolization and attempt to monopolize the market for TriCor and generic versions of TriCor, as alleged herein, have substantially affected interstate and foreign commerce.

## RELEVANT MARKET

10.     As to the claims so requiring, the relevant product market is the market for the manufacture and sale of TriCor, fenofibrate, and all generic bioequivalents rated "AB" by the FDA. The relevant geographic markets are the United States and its territories as a whole (Counts I and IV) and the Indirect Purchaser States (Counts II and III). At all relevant times, Defendants' market share in the relevant product and geographic markets ranged from

-3-

approximately 95% - 100%.

## PARTIES

11.     Plaintiff, Local 28, Sheet Metal Workers, is a union health and welfare fund duly
organized under the laws of New York. During the Class Period as described herein, Plaintiff
has paid for some or all of the purchase price of TriCor prescribed to one or more of its
participants or beneficiaries during the Class Period, and has thereby been injured, and continues
to be injured, as a result of Defendants' conduct.

12.     Defendant Abbott Laboratories ("Abbott") is a company incorporated under the
laws of the State of Illinois, with its principal place of business in Abbott Park, Illinois. Abbott
develops, manufactures, and markets pharmaceuticals and related products in the United States.

13.     Defendant Fournier Industrie et Sante, formerly known as Fournier Innovation et
Synergie, and Laboratories Fournier, S.A. (collectively referred to as "Fournier") are French
corporations, with their principal places of business at 42 Rue de Longvie, 21300 Chenove,
France.

## INTERSTATE TRADE AND COMMERCE

14.     During all or part of the Class Period, one or more Defendants manufactured and
sold substantial amounts of TriCor in a continuous and uninterrupted flow of commerce across
state and national lines and throughout the United States. Abbott maintained an exclusive
license to market and sell TriCor in the United States.

15.     At all material times, TriCor manufactured and sold by one or more Defendants
was shipped across state lines and sold to customers located outside its state of manufacture.

16.     During all or part of the Class Period (defined below), Defendants transmitted

funds as well as contracts, invoices and other forms of business communications and transactions

in a continuous and uninterrupted flow of commerce across state and national lines in connection

with the sale of TriCor.

17.    In furtherance of its efforts to monopolize and/or restrain competition in the

market for TriCor and its generic equivalents, Defendants employed the United States mails and

interstate and international telephone lines, as well as means of interstate and international travel.

18.    Defendant's efforts to monopolize and restrain competition in the market for

TriCor alleged herein has substantially affected interstate and foreign commerce.

## FACTUAL ALLEGATIONS

### A.    Brand-Name Drugs vs. Generic Drugs

19.    The manufacture, marketing, distribution and sale of prescription drugs is one of

the most profitable industries in the United States. The U.S. market accounts for more than 40%

of the world's prescription pharmaceutical revenues. The cost of prescription drugs in the

United States has been rising at a rate of 14% to 18% per year, and the cost of drugs dispensed in

the United States for the year 2001 was in the range of $160 billion to $170 billion.

20.    The availability of generic drugs has been one of the most effective means of

lowering the cost of prescription drugs. Generic drugs, which also must be approved by the

FDA, have the same active chemical composition and provide the same therapeutic effects as the

pioneer brand-name drugs upon which they are modeled. The FDA will assign an "AB" rating

to generic drugs that are bioequivalent to pioneer or brand-name drugs.

21.    To be deemed a therapeutic equivalent and assigned an "AB" rating by the FDA,

the generic drug must contain the same active ingredient(s); dosage form and route of

administration; and strength. If so, the generic drug, as a therapeutic equivalent, can be substituted (and in some instances must be substituted) for the pioneer or brand-name drug at the pharmacy dispensing the drug.

22.    Generic drugs are normally priced substantially below the brand-name drugs to which they are bioequivalent. A 1998 study conducted by the Congressional Budget Office (the "CBO") concluded that generic drugs save consumers and third-party payors between $8 billion and $10 billion a year. A report prepared by the Government Accounting Office in August 2000 observed, "Because generic drugs are not patented and can be copied by different manufacturers, they often face intense competition, which usually results in much lower prices than brand-name drugs."

23.    The Federal Trade Commission ("FTC") estimates that the first generic manufacturer to enter the market typically charges between 70% and 80% of the price of the brand-name drug. As additional manufacturers bring generic versions of the drug to market, the price continues to drop.

24.    A brand-name drug loses a significant portion of its market share to generic competitors soon after the introduction of generic competition, even if the brand-name manufacturer lowers prices to meet competition. The 1998 CBO study estimates that generic drugs capture at least 44% of the brand-name drug's market share in just the first year of sale.

**B.    The Federal Scheme For Approval Of Pioneer Drugs**

25.    Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (the "Act"), approval by the FDA is required before a company may begin selling a new drug. Pre-market approval for a new drug, often referred to as a "pioneer" or "brand-name" drug, must be

-6-

sought by filing a New Drug Application ("NDA") with the FDA, demonstrating that the drug is safe and effective for its intended use. New drugs that are approved for sale in the United States by the FDA are typically (but not necessarily) covered by patents, which provide the patent owner with the exclusive right to sell that new or pioneer drug in the United States for the duration of the patents involved, plus any extension of the original patent period (the "FDA Exclusivity Period") granted pursuant to the Drug Price Competition and Patent Term Restoration Act of 1984, 98 Stat. 1585, 21 U.S.C. § 355 ("Hatch-Waxman Act").

26.    In addition to information on safety and efficacy, NDA applicants must submit to the FDA a list of all "prior art," as well as patents that claim the drug for which FDA approval is being sought or that claim a method of using the drug and with respect to which a claim of patent infringement could reasonably be asserted. "Prior art" is the term used in patent law to refer to that body of previous knowledge and technology against which a patent application is judged to determine whether the claim is sufficiently novel to merit patent protection. When the NDA is approved, the FDA "shall publish" the patent information submitted by the NDA applicant. 21 U.S.C. § 355(b)(1).

27.    Once the NDA is approved, the FDA lists any patents referenced as part of the NDA application process in a publication known as the *Approved Drug Products With Therapeutic Equivalence Evaluations*. This publication is commonly called the "*Orange Book*."

28.    Once the safety and effectiveness of a new drug is approved by the FDA, it may be used in the United States only under the direction and care of a physician who writes a prescription, specifying the drug by name, which must be dispensed by a licensed pharmacist. The pharmacist must, in turn, fill the prescription with the drug brand specified by the physician,

-7-

unless an AB-rated generic version of that pioneer drug which has been approved by the FDA is available.

### C.    Prescriptions for Generic Drugs

29.    Generic drugs are drugs that the FDA has found to have the same active chemical composition and provide the same therapeutic effects as the pioneer, brand-name drugs. Where a generic drug is completely equivalent to a pioneer or brand-name drug, the FDA assigns the generic drug an "AB" rating.

30.    If a generic version of a brand-name drug exists and the physician has not specifically indicated on the prescription "DAW" or "dispense as written" (or similar indications, the wording of which varies slightly from state to state), then: (a) for consumers covered by most insurance plans, the pharmacist will substitute the generic drug; and (b) for consumers whose purchases are not covered by insurance plans, the pharmacist will offer the consumer the choice of purchasing the branded drug, or the AB-rated generic at a lower price.

31.    Once a physician writes a prescription for a brand-name drug such as TriCor, that prescription defines and limits the market to the drug named or its AB-rated generic equivalent. Only drugs which carry the FDA's AB generic rating may be substituted by a pharmacist for a physician's prescription for a brand-name drug.

### D.    Abbreviated New Drug Applications For Generic Drugs

32.    Congress enacted the Hatch-Waxman Act in 1984 to establish an abbreviated process to expedite and facilitate the development and approval of generic drugs. Consumers benefit from the choice and competition. To effectuate its purpose, the Hatch-Waxman Act permits a generic drug manufacturer to file an Abbreviated New Drug Application ("ANDA"),

which incorporates by reference the safety and effectiveness data developed and previously

submitted by the manufacturer of the original, pioneer drug. The Hatch-Waxman Act also

provides an economic incentive to the first ANDA filer for a particular generic drug: a 180-day

statutory period of market exclusivity, during which time the manufacturer has the right to

market its drug free from competition from other generic manufacturers.

33.    The ANDA must include information concerning the applicant's position *vis-a-vis*

the patent that the pioneer drug manufacturer claims applies to the drug. Therefore, the ANDA

filer must make one of four certifications:

      I.      that no patent for the pioneer drug has been filed with the FDA (a
            "Paragraph I Certification");

      II.     that the patent for the pioneer drug has expired (a "Paragraph II
            Certification");

      III.    that the patent for the pioneer drug will expire on a particular date and the
            generic company does not seek to market its generic product before that
            date (a "Paragraph III Certification"); or

      IV.    that the patent for the pioneer drug is invalid or will not be infringed upon
            by the proposed generic company's product (a "Paragraph IV
            Certification").

21 U.S.C. § 355(j)(2)(A)(vii). In the case of a patent that has not yet expired, the ANDA

applicant's only certification options are Paragraph III or IV Certifications.

34.    If the ANDA contains a Paragraph IV Certification, the ANDA applicant must

provide notice to the owner of each patent that is referred to in the certification, and to the holder

-9-

of the approved NDA to which the ANDA refers. *See* 21 U.S.C. § 355(j)(2)(B)(I). The notice must include a detailed statement of the factual and legal basis for the ANDA applicant's assertion that the patent is not valid or will not be infringed by the generic product. *See id.*; 21 C.F.R. § 314.95.

35.    The brand-name drug patent owner, upon receiving a Paragraph IV Certification from an ANDA applicant, has 45 days to initiate a patent infringement suit against the applicant. *See* 21 U.S.C. § 355(j)(5)(5)(iii). If no action is initiated within 45 days, the process for FDA approval of the generic product is not delayed by patent issues. However, if a patent infringement suit is brought within the 45-day window, FDA approval of the ANDA is automatically postponed until the earliest of the expiration of the patents, the expiration of 30 months from the patent holder's receipt of notice of the Paragraph IV Certification, or a final judicial determination of non-infringement.

36.    Accordingly, brand-name drug patent holders need only to file a patent infringement lawsuit within 45 days of receipt of Paragraph IV Certification in order to automatically block an ANDA applicant's generic drug from entering the market for up to 30 months.

37.    An improper Orange Book listing also has additional anti-competitive effects because the first generic company to file an ANDA with a Paragraph IV Certification is, upon FDA approval, granted a 180-day period of exclusivity in relation to other generic manufacturers. 21 U.S.C.  355(j)(5)(B)(iv). This 180 day exclusivity against other generic competitors is awarded to the first Paragraph IV filer regardless of whether or not the brand company institutes pre-approval patent infringement litigation in response to the Paragraph IV

-10-

certification. Absent an improper Orange Book listing, no Paragraph IV certification would be required and, thus, no generic company would receive 180-day exclusivity.

### E.    Defendants' Unlawful Scheme to Quash Generic Competition

#### 1.    TriCor

38.    TriCor is used to reduce high-levels of low-density lipoprotein cholesterol ("LDL-C"), sometimes referred to as "bad cholesterol," and triglycerides by promoting the dissolution and elimination of fat particles in the blood. TriCor also increases levels of high-density lipoprotein cholesterol ("HDL-C"), sometimes referred to as "good cholesterol," and reduces LDL-C in patients with primary hypercholesterolemia (high bad cholesterol) or mixed dyslipidemia (high bad cholesterol and high triglycerides). TriCor is also effective at reducing triglycerides in patients with hypertriglyceridemia (high triglycerides). The active pharmaceutical ingredient in TriCor is fenofibrate.

39.    Fenofibrate is a fibrate. Fibrates, statins, bile acid sequestrants, and niacin are categories of cholesterol-lowering drugs. Each of those categories addresses cholesterol conditions differently, each has different side effects, some more serious than others, and each has different efficacy profiles in reducing LDL-C, raising HDL-C, and lowering triglycerides. A cholesterol-lowering drug from any of the four categories is not reasonably interchangeable with a drug from another of the categories.

40.    Fibrate drugs include Tricor (fenofibrate), Atromid (clofibrate), and Lopid (gemfibrozil). Each fibrate drug is approved by the FDA for different indications, has different side effects, and is prescribed in specific and different circumstances that depend on the particular condition of the patient.

-11-

41.     The three types of fibrate drugs are not reasonably interchangeable because of the wide variations in side effects, differences in their approved indications, differences in how they are ingested, and other differences, including those related to their prescription and efficacy profiles.

42.     On January 23, 1990, the U.S. Patent and Trademark Office ("PTO") granted Defendant Fournier's application for U.S. Patent 4,895,726 ("'726 patent"). In its '726 patent, Fournier claimed a novel dosage form of fenofibrate that has been co-micronized with a solid surfactant for improved bioavailability. A solid surfactant is a surface-active agent that interacts with the surfaces of poorly soluable substances, such as fenofibrate, to help them dissolve. A micronized substance is one that has been reduced in size to the micron size range. This composition was presented in the form of gelatin capsules.

43.     In 1997, Fournier granted Abbott an exclusive license to the '726 patent in the United States. Abbott submitted a supplemental NDA for the TriCor 67 mg capsule on June 20, 1997, which was approved by the FDA on February 9, 1998. This supplemental NDA was a formulation revision to an approved NDA approved in 1993. Additionally, Abbott submitted separate NDAs for a 134 mg and a 200 mg TriCor capsule that were approved on June 30, 1999. All of these products came to market shortly after receiving final FDA approval on April 24, 2000, and the sales of these capsules rose to $158 million in 2000, and $277 million in 2001.

## 2.     The Illinois Patent Litigation

44.     On December 14, 1999, Novopharm Limited ("Novopharm"), which was subsequently acquired by Teva Pharmaceuticals, USA ("Teva"), filed an ANDA with the FDA requesting approval to market generic fenofibrate 67 mg capsules (the "Teva Capsule ANDA")

before the expiration of the '726 patent. Novopharm twice supplemented the Teva Capsule

ANDA, once on March 31, 2000 and once on November 27, 2000, in response to Abbott's

additional NDAs to request approval to market generic fenofibrate 134 mg and 200 mg capsules.

In connection with the Teva Capsule ANDA and each of its supplements, Novopharm certified

under Paragraph IV that the proposed generic fenofibrate capsule did not infringe the '726

patent.

45.     On May 9, 2000, Impax also filed an ANDA for fenofibrate capsules in all three

strengths ("Impax Capsule ANDA"). Impax similarly sought approval to market its fenofibrate

capsules prior to the expiration of the '726 patent, and accordingly certified under Paragraph IV

that its product did not infringe the '726 patent, and duly and timely notified Abbott of its

ANDA.

46.     On or about April 7, 2000, August 18, 2000 and March 19, 2001, respectively,

Defendants initiated a series of infringement actions in the United States District Court for the

Northern District of Illinois, against Teva (and its subsidiary, Novopharm) and Impax, alleging

that the generic drug manufacturers had infringed the '726 patent under 35 U.S.C. § 271(e)(2)

(these suits collectively referred to as the "Illinois Patent Litigation"). Under Hatch-Waxman,

these suits each imposed a 30-month stay on FDA approval of the Teva Capsule ANDA, its

supplements, and the Impax Capsule ANDA. As a result, the FDA could not approve any of

these ANDAs, and thus no generic competitor could enter the market with the TriCor capsules.

47.     The FDA granted tentative approval on the Impax Capsule ANDA on February

20, 2002, but acknowledged that final approval could not be granted until either the 30-month

stay expired, the court issued a final determination of non-infringement, or the '726 patent

-13-

expired.

48.    On March 19, 2002, the Illinois district court granted Teva's motion for summary judgment of non-infringement of the '726 patent in the Illinois Patent Litigation. In so doing, the Court construed various elements of the '726 patent and concluded that Teva's generic fenofibrate capsule product did not literally infringe the terms of that patent. The court also held that Abbott and Fournier were estopped from asserting a range of equivalents which might be construed to include Teva's generic fenofibrate product.

49.    Teva subsequently received FDA approval to market its 134 mg and 200 mg capsules on April 9, 2002, and came to market shortly thereafter. However, as a result of a change in FDA regulations regarding the application of the Hatch-Waxman mandatory 30-month stay, Teva received only tentative approval for its 67 mg capsule until the expiration of Abbott's time to appeal or determination by the court after appeal. Abbott appealed the court's determination of non-infringement of the '726 patent in the Illinois Patent Litigation to the U.S. Court of Appeals for the Federal Circuit.

50.    On March 20, 2003, the Federal Circuit affirmed the Illinois district court's granting of Teva's motion for summary judgment, which cleared the way for FDA approval on Teva's 67 mg fenofibrate capsule. Thus, as a result of the stay required by Hatch-Waxman, Teva was not able to launch its 67 mg capsule until late 2003.

51.    On March 26, 2003, days after the Federal Circuit affirmed Teva's non-infringement of the '726 patent, the Illinois district court granted Impax's motion for summary judgment of non-infringement of the '726 patent based, *inter alia*, on Impax's assertion of collateral estoppel on the basis of the earlier summary judgment that had been granted in the

-14-

Teva infringement actions. The FDA subsequently granted Impax final FDA approval to market its fenofibrate capsule products on October 28, 2003.

### 3. Abbott Converts the Market from TriCor Capsules to TriCor Tablets

52.     As alleged above, Defendants knew that by merely filing the Illinois Patent Litigation in a timely manner, they would, under the Hatch-Waxman regulatory framework, prevent the FDA from granting final approval to Teva and Impax for up to 30 months, regardless of whether Defendants' patent suits had any merit. Thus, even though Defendants lost the Illinois Patent Litigation, Defendants knew that by using the regulatory delay triggered by the mere filing of those actions, Defendants were able to delay competition from Teva's and Impax's generic fenofibrate capsule products for up to 30 months.

53.     Defendants used this delay to further suppress effective generic competition in the fenofibrate market by converting the demand in this market from capsules to tablets, and destroying most of the remaining demand for fenofibrate capsules before the generic manufacturers could obtain FDA approval of their ANDAs.

54.     While seeking approval for other dosage strengths for TriCor capsules, Defendants simultaneously filed a NDA for a TriCor tablet formulation in 54 mg and 160 mg strengths on November 10, 1999 ("Abbott's Initial Tablet NDA"). In seeking approval of Abbott's Initial Tablet NDA, the FDA required Abbott to establish the bioequivalence between TriCor capsules and the TriCor tablets, and update their NDA to include all studies and uses of the drug relating to other dosage forms and other dose levels.

55.     Abbott's Initial Tablet NDA was ultimately approved by the FDA on September

-15-

4, 2001, while the Illinois Patent Litigation was still ongoing, and the 30-month stays of Teva's and Impax's generic fenofibrate capsules were still in effect. This allowed Abbott to prosecute and obtain approval of Abbott's Initial Tablet NDA without fear of generic competition due to the 30-month stays imposed due to their filing of the Illinois Patent Litigation.

56.    Defendants' continued their scheme to convert the market from capsules to tablets through the following steps:

a.    Abbott's Initial Tablet NDA offered no benefits to consumers because they contained the same drug as the earlier-approved capsules and were bioequivalent to the capsules. However, the tablets offered huge benefits to Defendants because, unlike the capsules, there were no pending ANDAs seeking approval to market generic versions of the new tablet formulation at this time, and should any ANDA be filed along with a Paragraph IV certification, Defendants had the option to institute a patent infringement litigation, like the Illinois Patent Litigation, to invoke another 30-month stay.

b.    After receiving final approval from the FDA on Abbott's Initial Tablet NDA, Defendants stopped all new sales of TriCor capsules and directed their sales force to sell only TriCor tablets in the future and to pressure doctors not to write prescriptions for the capsule product.

c.    Defendants then removed the product code for the capsules from the National Drug Data File ("NDDF") maintained by First DataBank, even though they were not obligated to do so. Absent the removal of the capsule code from the NDDF, doctors could have still written prescriptions for TriCor capsules, and such prescriptions could have been filled by any FDA-approved generic capsule products that had been rated as a therapeutical equivalent of

-16-

the TriCor capsules. However, by removing the capsule code from the NDDF, Defendants

rendered this code obsolete. Because generic fenofibrate capsules could not be referenced to a

TriCor capsule code, and because Defendants removed TriCor capsules from the market, there

was no longer a brand reference drug for generic fenofibrate capsules. Since the generic

fenofibrate capsules were therapeutically equivalent to TriCor capsules and not TriCor tablets,

the removal of the TriCor capsule from the market and its code from the NDDF greatly impeded,

if not eliminated, the ability of doctors and pharmacies to substitute generic fenofibrate capsules

for a prescribed TriCor product. Thus, Defendants were able to maintain and extend their

monopoly in the market.

57.    Defendants cannot justify these acts by claiming a desire to introduce a

supposedly better or superior product because, as alleged below, the tablets provide no material

benefits to consumers that the capsules did not already provide. Moreover, even if the tablets

had some benefit over the capsules (which they did not), such benefit could have been offered

without eliminating demand for TriCor capsules and/or removing the capsule code from the

NDDF. Had Defendants not acted to destroy the demand for capsules, doctors and patients

would have been able to weigh the relative benefits (and prices) of capsules versus tablets, and

pick the formulation they preferred. Indeed, by withdrawing their capsules from the market, and

impeding generic substitution for prescriptions of the branded capsules, Abbott acted against

patients' interests by creating confusion and preventing patients who were using the capsules

from refilling or renewing existing prescriptions with capsules (including cheaper generic

capsules). If, in fact, Abbott was solely interested in providing additional medical options for

patients, Abbott would not have taken the additional step of impeding the sale of generic

-17-

—

capsules. However, since Defendants' ultimate goal was to interfere with and impede generic

competition, the existence of any ongoing sale of generic fenofibrate would undermine

Defendants' scheme.

58.    Defendants invested significant resources in developing the 54 mg and 160 mg

tablets. Defendants also invested significant resources in demonstrating to the FDA that the 54

mg and 160 mg tablets are bioequivalent to the already-approved capsule formulations as

required by the FDA. In doing so, however, defendants relied upon the same clinical studies that

had been submitted in support of their NDA for the TriCor capsules. Thus, the studies submitted

had been performed with the capsule formulations, not the tablet formulation. As the FDA

Medical Officer reviewing Abbott's 54 mg and 160 mg tablet NDA noted, "[t]hese studies,

however, were conducted with the standard and micronized formulation of fenofibrate.

Therefore, the approvability of this application relied on the demonstrated bioequivalence

between the tablet and older formulations of fenofibrate." Medical Officer's Review of New

Drug Application, August 30, 2000 (Mary H. Parks, M.D., Medical Officer) (available at

http://www.fda.gov/cder/foi/nda/2001/21-203 Tricor medr.pdf). As a result, in September 2000,

the FDA required Defendants to submit the results of a 2-way crossover bioequivalence study

that compared the 160 mg TriCor tablet with the 200 mg TriCor capsule in order to obtain

approval of Abbott's Initial Tablet NDA.

59.    Thus, in obtaining approval for the 54 mg and 160 mg tablets, Abbott established

that the bioavailability of two products did not differ significantly when the two products are

given in similar dosages under similar conditions. After all of the expenses of researching and

developing the 54 mg and 160 mg tablets, of submitting an NDA to the FDA in November 1999,

-18-

and of supporting that application with multiple submissions to the FDA through September 2000, Defendants merely succeeded in getting approval for products that were deemed equivalent to products Defendants already had on the market.

60.    Moreover, Defendants undertook the significant additional expenses of converting their manufacturing process to the tablet formulations.  Defendants undertook the significant additional expenses of "detailing" doctors and marketing the tablet formulations to health care entities with the goal of switching prescriptions and prescribing habits from the capsule products to the bioequivalent tablet products, which Defendants brought to the market at the same price as the capsule products.

61.    Since Defendants were already marketing bioequivalent products, the process of developing, approving, launching, and converting demand to the tablet products by taking sales from their existing products, would not likely have been anticipated to result in sufficient additional revenue to justify the significant associated expenses absent the anti-competitive impact on potential generic competition.  Absent the expected harm to generic competition resulting from introduction of the 54 mg and 160 mg tablet products, Defendants would not have brought those products to market.

62.    The purpose and effect of Defendants' strategy was to destroy (and/or severely limit) generic competition that otherwise would have existed in sales of fenofibrate capsules.  By engaging in the scheme set forth above, Abbott and Fournier did not simply delay sales of generic fenofibrate capsules; they took additional steps that had the purpose and effect of impeding those generic capsules from ever meaningfully competing with TriCor products, even once Impax and Teva were legally permitted to begin sales, by destroying any demand for

-19-

—

fenofibrate capsules before Teva or Impax could enter the market.

63.     As a result of Defendants' exclusionary conduct, Teva and Impax were denied the

opportunity to effectively launch their generic fenofibrate capsules, and were excluded from the

most efficient means of distributing their products.  When Teva was finally able to launch its

fenofibrate capsule (which remained bioequivalent to TriCor tablets but was sold at a fraction of

the cost), Teva captured only 5% of the fenofibrate market since there was no longer

substitutability of the generic capsule for the branded product, which was now a tablet.  This is

to be contrasted with the "generic erosion" which is usually observed in the marketplace upon

the launch of a generic bioequivalent to a branded product, where generics typically capture

from 40% to 80% (or more) of the brand's sales within the first year of launch.  Thus, as a direct

and proximate result of Defendants' overall scheme to monopolize, Defendants effectively

destroyed generic competition that should have started in 2001, and have improperly maintained

at least a 95% share of the market for fenofibrate products that would have eroded substantially
—
in the face of price competition from lower-cost generic products but for their anticompetitive

conduct.

#### 4. The Delaware Patent Litigation

64.     Having successfully preserved their blockbuster product (and monopoly profits)

from generic encroachment once, Defendants were quick to return to the same strategy when

generic competitors again threatened to enter the fenofibrate market.  In an apparent reaction to

Defendants' successful conversion of the fenofibrate market to TriCor tablets, on or around June

17, 2002, Teva filed with the FDA an ANDA for its generic fenofibrate 54 mg and 160 mg

-20-

approval of Teva's ANDA. The first 30-month stay was triggered by the first complaint filed (involving the '726, '670 and '405 patents), and it expired on February 26, 2005, 30 months after Abbott received Teva's first notice letter. The second 30-month stay was generated by the second complaint filed involving the '552 patent, and is set to expire in February 2006. Because of the modifications to Hatch-Waxman made by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Abbott is not entitled to a third stay based on the third complaint for infringement of the '881 patent.

68.    Similarly, Impax also sought to enter the fenofibrate market in the United States by filing an ANDA for fenofibrate tablets in or around December 2002. In connection with this ANDA, Impax submitted Paragraph IV certifications that the ANDA did not infringe the '726, the '670 and the '405 patents. As they had against Teva, Defendants sued Impax, asserting infringement of the '670 and the '405 patents. The filing of the initial infringement case, on January 23, 2003, triggered an automatic 30-month stay of approval of Impax's Tablet ANDA by the FDA. The issuance and *Orange Book* listing of the '552 patent resulted in an additional infringement case against Impax, and an additional 30-month stay. The listing of the '881 patent resulted in yet another suit against Impax, but again, as in the case of the suits against Teva, there was no additional 30-month stay associated with that infringement suit.

69.    On March 5, 2004, the FDA granted tentative approval to Impax's and Teva's tablet ANDAs, which meant that the FDA had determined that these generic products were bioequivalent to TriCor tablets of the same dosage strength, and that Teva and Impax had satisfied all the other regulatory requirements, such as demonstrating safety and efficacy, for sale of their fenofibrate products in the United States. The tentative approvals by the FDA would

-22-

have been final approvals but for the successive 30-month stays resulting automatically from Defendant's filing and maintenance of their patent infringement actions against Impax and Teva concerning the tablet ANDAs. Notably, both Teva and Impax have represented to this Court that, absent the 30-month stays, they would have received final approval on March 5, 2004, and would have entered the market shortly thereafter.

70. The various infringement suits in Delaware against Teva and Impax were consolidated and/or coordinated before this Court ("Delaware Patent Litigation"). The Delaware Patent Litigation was heavily litigated by and among Defendants, Teva and Impax, and trial was scheduled to begin on December 6, 2004. Defendants succeeded in getting this trial date pushed back six months, however, until June 6, 2005, through the filing of the subsequent infringement actions related to the `552 patent.

71. On May 6, 2005, this Court granted Teva's motion for summary judgment of non-infringement of the '670 patent, '552 patent, and the '405 patent. In doing so, the Court construed various elements of each of these patents and concluded, as the court had done in the Illinois Patent Litigation, that Teva's generic tablet product did not literally infringe the terms of any of those patents. The Court also held that Defendants were estopped from asserting a range of equivalents which might be construed to include Teva's generic fenofibrate tablets.

72. As a result of a court again granting Teva's motion for summary judgment, the FDA granted final approval to Teva's Tablet ANDA on May 13, 2005, which cleared the way for Teva to launch its fenofibrate tablet product in 54 mg and 160 mg strengths.

73. With less than a month to go before trial, Abbott and Fournier (having obtained the delay they sought) wrote to the Court in the Delaware Patent Litigation, acknowledging their

-23-

intention to seek a voluntary dismissal stating they had "concluded that they no longer wish[ed] to prosecute their consolidated infringement action against Defendants Teva and Impax."

74.      With the FDA approval of Teva's Tablet ANDA and the likely voluntary dismissal of the Delaware Patent Litigation, Teva could now launch its generic 54 mg and 160 mg tablets in the market to compete with the TriCor tablets.

75.      Abbott, however, converted the TriCor tablet market from a dosage strength of 54 mg and 160 mg, to 48 mg and 154 mg, respectively, again leaving Teva with no therapeutic equivalent for their approved generic product. As established by the listing of TriCor in the Orange Book, the 54 mg and 160 mg TriCor tablets have a generic therapeutic equivalent, which is Teva's Tablet ANDA approved on May 13, 2005, while no therapeutic equivalent exists for the 48 mg and 154 mg TriCor tablets.

    **5.    Abbott Converts the TriCor Tablet Market from 54 mg / 160 mg to a 48 mg / 148 mg Strength Tablets**

76.      While the Delaware Patent Litigation was ongoing, Defendants filed a NDA for TriCor tablets in 48 mg and 154 mg strengths on October 29, 2003 ("Abbott's Replacement Tablet NDA"). The new version tablets include the same medicine, and are indicated for the same uses, as the old formulation tablets. However, by virtue of the new strengths, these tablets would not be susceptible to substitution from a generic manufacturer's product approved pursuant to an ANDA filed on the previously-approved tablets.

77.      However, in connection with Abbott's Initial Tablet NDA, the FDA required Abbott, back in 2000, to update its Initial Tablet NDA to cover all studies and uses of TriCor tablets, including other dosage forms and dose levels to be approved. Now, Abbott's

-24-

Replacement Tablet NDA is merely a different dose level.

78.    On November 5, 2004, the FDA approved Abbott's Replacement Tablet NDA.

79.    In a familiar pattern, Abbott and Fournier then began marketing their new TriCor products, replacing the 54 mg and 160 mg tablet dosage forms. After receiving the FDA's approval of Abbott's Replacement Tablet NDA, Abbott's promotional material to consumers who had been taking TriCor tablets in the 54 mg or 160 mg strength included the following:

Q:    Do I have to switch to the new 145-mg or 48-mg tablets?

A:    Yes. The 160-mg and 54-mg tablets will no longer be available.

*See* http://www.tricortablets.com/consumer/patient_qa/index.htm (last visited May27, 2005). However, Teva's generic formulation of these TriCor tablets had already been approved by the FDA. Once there was no more supply of Defendants' 54 mg and 160 mg tablet formulations, Defendants removed the reference code in the NDDF for these formulations, impeding the substitution of branded TriCor prescriptions with cheaper generic fenofibrate tablets.

80.    Defendants' removal of the reference code in the NDDF for their 54 mg and 160 mg tablet formulations also made it more expensive for any patients to use Teva's fenofibrate tablets in the event that any doctors continue to write prescriptions for the 54 mg and/or 160 mg fenofibrate formulations. Patients will be forced to pay higher co-pay amounts for other manufacturers' 54 mg or 160 mg fenofibrate tablets when there is no reference code for TriCor 54 mg or 160 mg tablets in the NDDF than they would be required to pay for generic tablets if Abbott and Fournier maintained the reference in the NDDF. This is because, without a reference code in the NDDF for TriCor R 54 mg or 160 mg tablets, Teva's tablets would be treated as branded products rather than generic products. This same mechanism would have similarly

-25-

burdened Teva's and Impax's capsule products when Defendants acted to remove the TriCor capsule code from the NDDF.

81.     Based on the previous experience of the switch from the capsule to tablet, it is likely that the demand for the 54 mg and 160 mg tablets formulation will virtually disappear approximately six months after the date Defendants stopped marketing this formulation.

82.     As alleged above, but for Defendants' anticompetitive conduct, the tablet formulations would never have been introduced, since generic capsules would have dominated the market, and the new tablets offered no material benefits over the capsules. In the alternative, however, if Defendants would have introduced the tablets absent the anticompetitive conduct, the generic manufacturers would have started selling their generic fenofibrate 54 mg and 160 mg tablets shortly after March 5, 2004, the date on which FDA granted tentative approval (and, but for Defendants' conduct, would have granted final approval) to Impax's and Teva's tablet ANDAs. Defendants only received approval for their new formulation NDA in November of 2004, so they could not have started their efforts to switch the market until that time. Thus, but for Defendants' conduct, Impax and Teva would have started selling their fenofibrate tablets more than eight months before Defendants could have started converting the market to their new tablet formulation.

83.     Had Teva and Impax been able to start selling their tablets in March of 2004, the generic manufacturers would have successfully entered the fenofibrate market and would have captured significant sales. Impax and Teva also would be able to maintain demand for the 54 mg and 160 mg tablets even if Defendants were subsequently to remove the reference for TriCor 54mg or 160 mg tablets from the NDDF. This is because if a generic fenofibrate formulation is

-26-

available on the market before Defendants are able to complete the switch, there would continue to be pressure from the managed care industry for patients to continue to be prescribed the 54 mg and 160 mg tablets. If, however, a generic product does not get to market before the switch is completed, the managed care industry will not exert pressure to return patients to the 54 mg and 160 mg tablets once those generic tablets become available. By taking actions that have postponed the launch date for Teva's and Impax's fenofibrate tablets, Defendants have again barred Teva and Impax from availing themselves of the most efficient and practical means of distributing their generic drug products, again effectively preserving the fenofibrate market solely for the benefit of Defendants' monopoly profits.

84.    Defendants' conduct is intended to prevent, and likely will prevent, new prescriptions for the 54 mg and 160 mg fenofibrate tablet formulations from being written, and will encourage current prescriptions for the 54 mg and 160 mg fenofibrate tablet formulations to be converted to the replacement formulations. In the future, this will mean that a pharmacist will not be presented with a prescription that would allow for substitution with a generic version of the 54 mg and 160 mg tablet formulations, should one become available.

85.    Upon information and belief, the IMS Health Incorporated ("IMS") data concerning the prescription of fenofibrate products in the United States from November 2004 up to the week of February 11, 2005 shows that over 93% of the fenofibrate market had already been converted from the 54 mg and 160 mg TriCor tablets to the 48 mg and 145 mg TriCor tablets, as reflected by the proportion of new prescriptions. Thus, Defendants again effectively eliminated the market where their TriCor product is exposed to generic competition.

86.    In connection with their NDAs for TriCor capsules and for TriCor 54 mg and 160

-27-

mg tablets, Defendants submitted data to the FDA showing that those products are safe and effective. By approving Defendants' NDAs for those products, the FDA determined that those products are, among other things, safe and effective. Importantly, Defendants have not disclosed any health or safety concerns, or any other concerns, with their capsule formulation of TriCor that justifies removing the product from the market and removing it from the NDDF. Similarly, Defendants have not disclosed any health or safety concerns, or any other concerns, with their 54 mg or 160 mg tablet formulations of TriCor that justifies removing those products from the market and removing them from the NDDF. In fact, Defendants' new product introduction is simply an additional tactic to maintain their monopoly in sales of fenofibrate products in the United States and to exclude Teva and Impax from the $750 million fenofibrate market.

F.    **Monopoly Power**

87.    Through the anticompetitive conduct alleged herein, Defendants were able to charge supracompetitive prices for fenofibrate, and thus, by definition, maintained monopoly power with respect to fenofibrate sold in the United States. To the extent that Plaintiffs are legally required to prove monopoly power circumstantially by first defining a relevant product market, Plaintiffs allege that the relevant product market is all fenofibrate products - i.e., TriCor (in all its forms and dosage strengths), and bioequivalent fenofibrate products. There are no reasonably interchangeable drug products that are available to prescribing physicians for the indications for which fenofibrate is prescribed. For the entire period relevant to this case, Defendants have been able to profitably maintain the price of their branded fenofibrate products well above competitive levels.

88.    The relevant geographic market is the United States and its territories.

-28-

89.     Defendants' market share in the relevant market is and was 100% at all times prior to the sale of Teva's fenofibrate capsules in the United States, and has been at least 95% thereafter.

90.     Defendants' actions are part of, and in furtherance of, the illegal monopolization alleged herein, were authorized, ordered or done by Defendants' officers, agents, employees or representatives while actively engaged in the management of Defendants' affairs.

91.     Defendants' illegal acts to prevent the introduction and/or dissemination into the U.S. marketplace of any generic version of TriCor resulted in Plaintiffs and the Class paying more than they would have paid for fenofibrate, absent Defendants' illegal conduct.

## G.     Effects on Competition and Damages to Plaintiffs and Class

92.     Defendants' exclusionary conduct has delayed or prevented the sale of generic fenofibrate in the United States, and unlawfully enabled Defendants to sell TriCor at artificially inflated prices. But for Defendants' illegal conduct, generic competitors would have been able to successfully market generic versions of TriCor capsules by at least April 9, 2002, and additional generic competitors would have entered the market thereafter. Moreover, to the extent that demand for 54mg and 160mg fenofibrate tablets would have existed but for Defendants' illegal conduct, generic competitors would have begun marketing generic versions of TriCor tablets by at least March 5, 2004, and additional generic competitors would have entered the market thereafter.

93.     Defendants' pattern and practice of delaying generic entry while simultaneously changing product formulations and discontinuing existing products and delisting the drug from the NDDF, as alleged above, is exclusionary and unreasonably restrains competition. To the

-29-

extent that Abbott and Fournier have any valid business purpose for their conduct, that purpose could be served by means that are less restrictive of competition, and would at all events be outweighed by the anticompetitive effects of the conduct. Among other things, Defendants could have launched a new tablet product without taking affirmative steps to destroy the demand for the existing capsule product. Defendants' conduct has allowed, and continues to allow, them to maintain a monopoly and exclude competition in the relevant market, to the detriment of all fenofibrate purchasers, including Plaintiff and members of the Class. Accordingly, the anticompetitive effects of Defendants' conduct clearly outweigh the purported procompetitive benefits (if any) of such conduct.

94.    Similarly, Defendants cannot justify their conduct with any supposed consumer benefit, as the enormous cost savings offered by generic drugs outweigh any supposed benefit from the new formulations of TriCor, which benefits are illusory and/or could have been obtained without taking affirmative steps to destroy demand for fenofibrate capsules. Defendants' exclusionary motive is also illustrated by their willingness to sacrifice profits as part of the market switch strategy: Defendants' decision to incur the extra costs necessary to change formulations was economically rational only if the change has the effect of excluding generic competition. Defendants' introduction of the 54 mg and 160 mg tablets, which were bioequivalent to Defendants' capsules, and which relied upon the same clinical studies as were used to support the capsule NDA, was itself anti-competitive. But for the impact on generic competition, Defendants would not have invested the resources necessary to bring the 54 mg and 160 mg tablets to the market. But for the impact on generic competition, it would not have been economically rational to invest in the process of developing the bioequivalent tablet formulation,

seeking FDA approval of that formulation, changing the manufacturing process, and engaging in significant marketing efforts to switch the market from capsules to the equivalently priced tablets.

95.     If manufacturers of generic fenofibrate had been able to enter the marketplace and effectively compete with Defendants earlier, as set forth above, Plaintiff and other members of the Class would have substituted lower-priced generic fenofibrate for the higher-priced brand-name TriCor for some or all of their fenofibrate requirements, and/or would have received discounts on some or all of their remaining TriCor purchases.

## CLASS ACTION ALLEGATIONS

96.     Plaintiff brings this action on behalf of itself and as representative of a Class defined as follows:

> All persons or entities throughout the United States and its territories who purchased and/or paid for TriCor or generic versions of TriCor during the period April 9, 2002 to the present ("the Class Period") for consumption by themselves, their families, or their members, employees, insureds, participants or beneficiaries (the "Class"). For purposes of the Class definition, persons and entities "purchased" TriCor if they paid some or all of the purchase price.

Excluded from the Class are all Defendants, their officers, subsidiaries and affiliates; all government entities (except for government-funded employee benefit plans); all persons or entities that purchased TriCor for purposes of resale, or directly from any of the Defendants or their affiliates; and the judge in this case and any members of his/her immediate family.

97.     Plaintiffs seek class certification pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure as to declaratory and equitable relief sought herein, and Rule 23(b)(3) as to the damages sought herein.

98.    Although Plaintiff does not know the exact number of class members, it believes

it to be, at a minimum, in the tens of thousands. TriCor has annual U.S. sales of approximately

$750 million for the twelve months ending December 2004 and are expected to exceed $1 billion

by the end of 2006. Thus, members of the Class are numerous and joinder is impracticable. The

Class members are identifiable, *inter alia*, from information and records that are required by law

to be maintained by pharmacies, drugstores, pharmaceutical benefits managers, and managed

care organizations.

99.    Questions of law and fact common to the members of the Class predominate over

questions, if any, that may affect only individual members, in part because Defendants have

acted and refused to act on grounds generally applicable to the entire Class, thereby making

appropriate equitable, injunctive and declaratory relief with respect to the Class as a whole.

Such conduct includes the Defendants' exclusionary and anti-competitive efforts in filing sham

litigation and converting the relevant market from one confronted with generic competition to

one that is not for the sole purpose of monopolizing and attempting to monopolize the market for

TriCor.

100.    Questions of law and fact common to the Class include:

(a)    whether Defendants maintained or attempted to maintain monopoly power by delaying generic entry;

(b)    whether direct proof of Defendants' monopoly power is available, and if available, whether it is sufficient to prove Defendants' monopoly power without the need to also define a relevant market;

(c)    to the extent a relevant market or markets must be defined, what that definition is or those definitions are;

(d)    whether the activities of Defendants as alleged herein have substantially affected interstate commerce;

-32-

(e)     whether Defendants' litigation asserting infringement of its patents
described herein was baseless;

(f)     whether Defendants engaged in sham litigation for the purpose of
preventing competition;

(g)     whether Defendants intentionally and unlawfully excluded competitors
and potential competitors from the market for TriCor and generic bio-
equivalents to TriCor;

(h)     whether Plaintiff and members of the Class are entitled to declaratory,
equitable and/or injunctive relief; and

(I)     whether Plaintiff and the Class have been damaged and the aggregate
amount of damages.

101.    Plaintiff's claims are typical of the members of the Class, in that Plaintiff

purchased and/or paid for TriCor throughout the United States, including the Indirect Purchaser

States, during the Class Period. Such purchases and payments were made for consumer

consumption of TriCor. Plaintiff and all members of the Class were damaged by the same

wrongful conduct of Defendants.

102.    Plaintiff will fairly and adequately protect and represent the interests of the Class.

The interests of Plaintiff are not antagonistic to those of the Class. In addition, Plaintiff is

represented by counsel who are experienced and competent in the prosecution of complex class

action antitrust litigation.

103.    Class action treatment is a superior method for the fair and efficient adjudication

of the controversy, in that, among other things, such treatment will permit a large number of

similarly situated persons to prosecute their common claims in a single forum simultaneously,

efficiently, and without the unnecessary duplication of evidence, effort, and expense that

numerous individual actions would engender. The benefits of proceeding through the class

mechanism, including providing injured persons or entities with a method for obtaining redress

for claims that it might not be practicable to pursue individually, substantially outweigh any

difficulties that may arise in management of this class action.

104.    Plaintiff knows of no difficulty to be encountered by litigating of this action that

would preclude its maintenance as a class action.

### FIRST CAUSE OF ACTION

### FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER
### SECTION 16 OF THE CLAYTON ACT FOR DEFENDANTS'
### VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT

105.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though

set forth herein.

106.    As described above, Defendants knowingly and willfully engaged in a course of

conduct designated to improperly obtain and extend their monopoly power in the Relevant

Markets. This course of conduct included, *inter alia*, the following acts: (i) the prosecution of

baseless, sham patent litigation(s) against a potential generic manufacturer(s); (ii) the intentional

conversion of the relevant market from one confronting generic competition to one that is not;

and (iii) the intentional frustration of generic competition by effectively eliminating the ability

for a generic therapeutic equivalent to be substituted for a TriCor product. The result of

Defendants' unlawful conduct has been to obtain and extend their monopoly.

107.    Defendants intentionally and wrongfully created and maintained a monopoly

power in the Relevant Markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

108.    Plaintiff and the other members of the Class have been injured in their business or

property by reason of Defendants' antitrust violation alleged in this Count. Their injury consists

-34-

of being deprived of the ability to purchase less expensive, generic versions of TriCor, and

paying higher prices for such products than they would have paid in the absence of the antitrust

violation. The injury to Plaintiff and the Class is the type of injury antitrust laws were designed

to prevent, and the injury flows from Defendants' unlawful conduct.

109.    Plaintiff and the Class, pursuant to Rule 57 of the Federal Rules of Civil

Procedure and 18 U.S.C. § 2201(a), hereby seek a declaratory judgment that Defendants'

conduct in seeking to prevent competition as described herein violates Section 2 of the Sherman

Act.

110.    Plaintiff and the Class further seek equitable and injunctive relief pursuant to

Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the

anti-competitive market effects caused by the unlawful conduct of Defendants, and other relief

so as to assure that similar anti-competitive conduct does not occur in the future.

## SECOND CAUSE OF ACTION

### FOR COMPENSATORY AND MULTIPLE DAMAGES UNDER
### THE ANTITRUST AND/OR CONSUMER PROTECTION STATUTES
### OF THE INDIRECT PURCHASER STATES

111.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though

set forth herein.

112.    Defendants' conduct described herein constitutes unlawful acts of monopolization

and attempts to monopolize, as well as prohibited practices and unconscionable conduct under

the antitrust and/or unfair and deceptive trade practices acts of the Indirect Purchaser States, as

follows:

a.    Arizona: The aforementioned practices by Defendants were and are in

-35-

violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, *et seq.*, the Arizona Consumer Fraud Act, Ariz. Rev. Stat §§ 44-1521, *et seq.*, and the Constitution of the State of Arizona, Article 14, §15;

      b.    California: The aforementioned practices by Defendants were and are in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and the California Unfair Competition Act, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

      c.    District of Columbia: The aforementioned practices by Defendants were and are in violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et seq.*;

      d.    Florida: The aforementioned practices by Defendants were and are in violation of the Florida Antitrust Act, Fla. Stat. Ann. §§ 542.15, *et seq.*, and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §§ 501.201, *et seq.*;

      e.    Hawaii: The aforementioned practices by Defendants were and are in violation of Hawaii Revised Statues §§ 480-2, 480-3, and 480-4.

      f.    Iowa: The aforementioned practices by Defendants were and are in violation of the Iowa Competition Law, Iowa Code §§ 553.4, 553.5 (1997);

      g.    Kansas: The aforementioned practices by Defendants were and are in violation of the Kansas Monopolies and Unfair Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.*, and the Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50-623, *et seq.*;

      h.    Kentucky: The aforementioned practices by Defendants were and are in violation of the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq.,* and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann §§ 365.020, *et seq.*;

      i.    Louisiana: The aforementioned practices by Defendants were and are in

violation of the Louisiana Monopolies Law, La. Rev. Stat. Ann. §§ 51:121, *et seq.,* and the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et seq.*;

      j.     Maine: The aforementioned practices by Defendants were and are in violation of the Maine Monopolies and Profiteering Statute, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*, and the Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. tit. 5, §§ 205-A, *et seq.*;

      k.     Massachusetts: The aforementioned practices by Defendants were and are in violation of the Massachusetts Antitrust Act, Mass. Gen. Laws, ch. 93, and the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A;

      l.     Michigan: The aforementioned practices by Defendants were and are in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws §§445.771, *et seq.*, and the Michigan Consumer Protection Act, §§ 445.901, *et seq.*;

      m.     Minnesota: The aforementioned practices by Defendants were and are in violation of the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49, *et seq.,* and the Minnesota Consumer Fraud Act, Minn. Stat §§ 325F.67, *et seq.*;

      n.     Mississippi: The aforementioned practices by Defendant were and are in violation of the Mississippi antitrust statute, Miss. Code Ann. §§75-21-1 *et seq.*;

      o.     Nebraska: The aforementioned practices by Defendant were and are in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*;

      p.     Nevada: The aforementioned practices by Defendants were and are in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §§ 598A.010, *et seq.*, and the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.*;

q.    New Jersey: The aforementioned practices by Defendants were and are in violation of the New Jersey Antitrust Act, N.J. Stat. Ann. §§ 56:9-1, *et seq*., and the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq*.;

r.    New Mexico: The aforementioned practices by Defendants were and are in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq*., and the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1, *et seq*.;

s.    New York: The aforementioned practices by Defendants were and are in violation of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq*., and the New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq*.;

t.    North Carolina: The aforementioned practices by Defendants were and are in violation of North Carolina's antitrust and unfair competition law, N.C. Gen. Stat. §§ 75-1, *et seq*.;

u.    North Dakota: The aforementioned practices by Defendants were and are in violation of the North Dakota Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq*., and the North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51-15-01, *et seq*.;

v.    South Dakota: The aforementioned practices of Defendants were and are in violation of South Dakota's antitrust law, S.D. Codified Laws §§ 37-1-3, *et seq.,* and deceptive trade practices and consumer protection law, S.D. Codified Laws §§ 37-24-1, *et seq*.;

w.    Tennessee: The aforementioned practices of Defendants were and are in violation the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq*., and the Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101, *et seq*.;

x.    Vermont: The aforementioned practices of Defendants were and are in

-38-

violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*;

       y.     West Virginia: The aforementioned practices by Defendants were and are in violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq.*, and the West Virginia Consumer Credit and Protection Act, W. Va. Code §§ 46A-6-101, *et seq.*; and

       z.     Wisconsin: The aforementioned practices by Defendants were and are in violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.*, and the Wisconsin Unfair Trade Practices Act, Wis. Stat. §§ 100.20, *et seq.*

      113.    As a result of the conduct described above, Plaintiff and the Class have sustained and will continue to sustain substantial losses and damage to their businesses and property in the form of, *inter alia*, being deprived of the ability to purchase less expensive, generic versions of TriCor, and paying prices for such products that were higher than they would have been but for Defendants' improper actions. The full amount of such damages are presently unknown and will be determined after discovery and upon proof at trial.

      114.    Plaintiff and the Class seek damages, multiple damages, treble damages, and other damages as permitted by state law, for their injuries caused by these violations pursuant to these statutes.

### THIRD CAUSE OF ACTION

### FOR INJUNCTIVE AND DECLARATORY RELIEF UNDER THE ANTITRUST AND/OR CONSUMER PROTECTION STATUTES OF THE INDIRECT PURCHASER STATES

      115.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

      116.    Defendants' conduct described herein constitutes unlawful acts of monopolization

-39-

and attempts to monopolize, as well as prohibited practices and unconscionable conduct under the antitrust and/or unfair and deceptive trade practices acts of the Indirect Purchaser States, as follows:

      a.     Arizona: The aforementioned practices by Defendants were and are in violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, *et seq.*, the Arizona Consumer Fraud Act, Ariz. Rev. Stat §§ 44-1521, *et seq.*, and the Constitution of the State of Arizona, Article 14, §15;

      b.     California: The aforementioned practices by Defendants were and are in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and the California Unfair Competition Act, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

      c.     District of Columbia: The aforementioned practices by Defendants were and are in violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, *et seq.*;

      d.     Florida: The aforementioned practices by Defendants were and are in violation of the Florida Antitrust Act, Fla. Stat. Ann. §§ 542.15, *et seq.*, and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §§ 501.201, *et seq.*;

      e.     Hawaii: The aforementioned practices by Defendants were and are in violation of Hawaii Revised Statues §§ 480-2, 480-3, and 480-4.

      f.     Iowa: The aforementioned practices by Defendants were and are in violation of the Iowa Competition Law, Iowa Code §§ 553.4, 553.5 (1997);

      g.     Kansas: The aforementioned practices by Defendants were and are in violation of the Kansas Monopolies and Unfair Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.*, and the Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50-623, *et seq.*;

-40-

h.    Kentucky: The aforementioned practices by Defendants were and are in violation of the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq.,* and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann §§ 365.020, *et seq.*;

i.    Louisiana: The aforementioned practices by Defendants were and are in violation of the Louisiana Monopolies Law, La. Rev. Stat. Ann. §§ 51:121, *et seq.,* and the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et seq.*;

j.    Maine: The aforementioned practices by Defendants were and are in violation of the Maine Monopolies and Profiteering Statute, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.,* and the Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. tit. 5, §§ 205-A, *et seq.*;

k.    Massachusetts: The aforementioned practices by Defendants were and are in violation of the Massachusetts Antitrust Act, Mass. Gen. Laws, ch. 93, and the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A;

l.    Michigan: The aforementioned practices by Defendants were and are in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws §§445.771, *et seq.,* and the Michigan Consumer Protection Act, §§ 445.901, *et seq.*;

m.    Minnesota: The aforementioned practices by Defendants were and are in violation of the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49, *et seq.,* and the Minnesota Consumer Fraud Act, Minn. Stat §§ 325F.67, *et seq.*;

n.    Mississippi: The aforementioned practices by Defendant were and are in violation of the Mississippi antitrust statute, Miss. Code Ann. §§75-21-1 *et seq.*;

o.    Nebraska: The aforementioned practices by Defendant were and are in

-41-

violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*;

      p.    Nevada: The aforementioned practices by Defendants were and are in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §§ 598A.010, *et seq.*, and the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.*;

      q.    New Jersey: The aforementioned practices by Defendants were and are in violation of the New Jersey Antitrust Act, N.J. Stat. Ann. §§ 56:9-1, *et seq.*, and the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.*;

      r.    New Mexico: The aforementioned practices by Defendants were and are in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq.*, and the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1, *et seq.*;

      s.    New York: The aforementioned practices by Defendants were and are in violation of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*, and the New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.*;

      t.    North Carolina: The aforementioned practices by Defendants were and are in violation of North Carolina's antitrust and unfair competition law, N.C. Gen. Stat. §§ 75-1, *et seq.*;

      u.    North Dakota: The aforementioned practices by Defendants were and are in violation of the North Dakota Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.*, and the North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51-15-01, *et seq.*;

      v.    South Dakota: The aforementioned practices of Defendants were and are in violation of South Dakota's antitrust law, S.D. Codified Laws §§ 37-1-3, *et seq.*, and deceptive trade practices and consumer protection law, S.D. Codified Laws §§ 37-24-1, *et seq.*;

-42-

   w. Tennessee: The aforementioned practices of Defendants were and are in violation the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.*, and the Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101, *et seq.*;

   x. Vermont: The aforementioned practices of Defendants were and are in violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*;

   y. West Virginia: The aforementioned practices by Defendants were and are in violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq.*, and the West Virginia Consumer Credit and Protection Act, W. Va. Code §§ 46A-6-101, *et seq.*; and

   z. Wisconsin: The aforementioned practices by Defendants were and are in violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.*, and the Wisconsin Unfair Trade Practices Act, Wis. Stat. §§ 100.20, *et seq.*

  117. Plaintiff and the other members of the Class have been injured in their business or property by reason of Defendants' antitrust violation alleged in this Count. Their injury consists of being deprived of the ability to purchase less expensive, generic versions of TriCor, and paying higher prices for TriCor and generic versions of TriCor than they would have paid but for Defendants' improper actions. The injury to Plaintiff and the Class is the type of injury antitrust laws were designed to prevent, and the injury flows from Defendants' unlawful conduct.

  118. Plaintiff and the Class, pursuant to laws of the Indirect Purchaser States, hereby seek a declaratory judgment that Defendants' conduct in seeking to prevent competition through scheme set forth herein is unlawful. Plaintiff and the Class further seek equitable and injunctive relief pursuant to the laws of the Indirect Purchaser States to correct for the anti-competitive market effects and other harms to purchasers caused by the unlawful conduct of Defendants, and

other relief so as to assure that similar conduct does not occur in the future.

## FOURTH CAUSE OF ACTION

### UNFAIR AND DECEPTIVE TRADE PRACTICES IN VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT

119.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

120.    As described herein, Defendants have intentionally and repeatedly used deception, fraud, false pretense, false promise, misrepresentation, and/or concealment, suppression or omission of material facts in connection with the sale or advertisement of TriCor, including but not limited to preventing or suppressing competition from generic versions of the drug by removing the NDDC codes of earlier versions of the brand name drug so that there would not be any brand name version to which the generic versions approved by the FDA could be equivalent. Doctors, patients and third-party payors were misled by Defendants into believing that they must purchase TriCor instead of generic versions of the discontinued forms of TriCor at a fraction of the price. It was the intent of Defendants that others rely on said concealment, suppression or omissions.

121.    Defendants knew that its misleading publications and representations as to TriCor were being relied upon by physicians, Plaintiff and the Class for the purpose of prescribing or paying claims for TriCor.

122.    Defendants have therefore violated the Delaware Consumer Fraud Act, 6 Del. C. §§ 2511, *et seq.*, in particular, 6 Del. C. § 2513(a), causing Plaintiff and the Class to suffer damage in the form of payments for TriCor that were substantially more than payments would have been for generic versions of TriCor in its earlier forms.

-44-

123.    Plaintiff and the members of the Class are therefore entitled to an award of

compensatory damages in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION

### UNFAIR AND DECEPTIVE TRADE PRACTICES IN VIOLATION OF ALL STATES' CONSUMER PROTECTION ACTS

124.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth

herein.

125.    Alternatively, Defendants' actions, as complained of herein, constitute unfair

competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of

various state consumer protection statutes listed below:

(a)    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Ala. Code § 8-19-1, *et seq.*;

(b)    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Alaska Stat. Code § 45.50.471, *et seq.*;

(c)    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

(d)    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Ark. Code § 4-88-101, *et seq.*;

(e)    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*;

(f)    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices or have made false representations in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*;

(g)    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*;

      (h)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*;

      (i)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code § 28-3901, *et seq.*;

      (j)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

      (k)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. Stat. § 10-1-392, *et seq.*;

      (l)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*;

      (m)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*;

      (n)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, *et seq.*;

      (o)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0.5.1, *et seq.*;

      (p)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Iowa Code § 714.1b, *et seq.*;

      (q)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;

      (r)    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Ky. Rev. Stat. § 367.110, *et seq.*;

(s)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. § 51:1401, *et seq.*;

(t)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, *et seq.*;

(u)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*;

(v)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

(w)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*;

(x)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*;

(y)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Miss. Code Ann. § 75-24-1, *et seq.*;

(z)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

(aa)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code § 30-14-101, *et seq.*;

(bb)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*;

(cc)    Defendants have engaged in unfair competition or unfair or deceptive acts

-47-

or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

(dd)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*;

(ee)    Defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*;

(ff)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1 *et seq.*;

(gg)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

(hh)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

(ii)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*;

(jj)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*;

(kk)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

(ll)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*;

(mm)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*;

(nn)    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.*;

      (oo)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*;

      (pp)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1; *et seq.*;

      (qq)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*;

      (rr)   Defendants have engaged in unfair competition or unfair or deceptive or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*;

      (ss)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-1 1-1, *et seq.*;

      (tt)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, § 245 1, *et seq.*;

      (uu)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*;

      (vv)   Defendants have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of Wash. Rev. Code. § 19.86.010, *et seq.*;

      (ww)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101 , *et seq.*;

      (xx)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.20, *et seq.*; and

      (yy)   Defendants have engaged in unfair competition or unfair or deceptive acts

-49-

or practices in violation of Wyo. Stat. § 40-12-100, *et seq.*

126.    As a direct and proximate result of Defendants' unfair methods of competition
and unfair or deceptive acts or practices, Plaintiff and the Class have suffered actual economic
damage by paying for TriCor instead of the equally efficacious generic version.

## SIXTH CAUSE OF ACTION

## FOR RESTITUTION, DISGORGEMENT AND CONSTRUCTIVE
## TRUST FOR  UNJUST ENRICHMENT BY DEFENDANTS

127.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though
set forth herein.

128.    As a result of their unlawful conduct described above, Defendants have been and
will continue to be unjustly enriched.  Specifically, Defendants have been unjustly enriched, to
the detriment of Plaintiff and the Class by the receipt of, at a minimum, unlawfully inflated
prices and/or illegal monopoly profits on their sale of TriCor.

129.    Defendants have benefited from their unlawful acts and it would be inequitable
for Defendants to be permitted to retain any of their ill-gotten gains resulting from the
overpayments for TriCor made by Plaintiff and the Class.

130.    Plaintiff and members of the Class are entitled to the amount of Defendants' ill-
gotten gains resulting from Defendants' unlawful, unjust and inequitable conduct.  Plaintiff and
the Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains
from which Plaintiff and the Class members may make claims on a *pro rata* basis.

**WHEREFORE**, Plaintiff prays that:

(a)    the Court determine that this action may be maintained as a class action
pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to Plaintiff's

-50-

claims for declaratory, equitable and injunctive relief, and Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to the claims for damages; and declare Plaintiff as the representative of the Class;

        (b)     the conduct alleged herein be declared, adjudged and decreed to be in violation of Section 2 of the Sherman Act, of the statutes of the Indirect Purchaser States set forth above, and the common law of unjust enrichment;

        (c)     Plaintiff and each member of the Class be awarded damages and, where applicable, treble, multiple, and other damages, according to the laws of the Indirect Purchaser States, including interest;

        (d)     Plaintiff and each member of the Class recover the amounts by which Defendants have been unjustly enriched;

        (e)     Defendants be enjoined from continuing the illegal activities alleged herein;

        (f)     Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees and expenses as provided by law;

        (g)     Plaintiff and the Class be granted such other and further as the Court deems just and necessary.

-51-

Dated: July 21, 2005



BY:

Michael I. Silverman
SILVERMAN, MCDONALS & FRIEDMAN
1010 North Bancroft Parkway, Suite 22
Wilmington, DE 19805
Phone: (302) 888-2900
Fax: (302) 888-2923

Thomas M. Sobol (pro hac vice forthcoming)
David S. Nalven, DN-2374
HAGENS BERMAN SOBOL SHAPIRO
One Main Street, 4th Floor
Cambridge, MA 02142
Phone: (617) 482-3700
Fax: (617) 482-3003

Steve W. Berman (pro hac vice forthcoming)
HAGENS BERMAN SOBOL SHAPIRO
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Phone: (206) 623-7292
Fax: (206) 623-0594

Jason Thompson (pro hac vice forthcoming)
Ann K. Mandt (pro hac vice forthcoming)
CHARFOOS & CHRISTENSEN, P.C.
5510 Woodward Ave.
Detroit, MI 48202
Phone: (313) 875-8080
Fax: (313) 875-9857

Ronald Goldser (pro hac vice forthcoming)
ZIMMERMAN REED
651 Nicolette Mall, Ste. 501
Minneapolis, MN 55402
Phone: (612) 341-0400

*Attorneys for Plaintiffs and the Proposed Class*

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

Dated: July 21, 2005                    BY:

Michael I. Silverman
SILVERMAN, MCDONALS & FRIEDMAN
1010 North Bancroft Parkway, Suite 22
Wilmington, DE 19805
Phone: (302) 888-2900
Fax: (302) 888-2923

Thomas M. Sobol (pro hac vice forthcoming)
David S. Nalven, DN-2374
HAGENS BERMAN SOBOL SHAPIRO
One Main Street, 4th Floor
Cambridge, MA 02142
Phone: (617) 482-3700
Fax: (617) 482-3003

Steve W. Berman (pro hac vice forthcoming)
HAGENS BERMAN SOBOL SHAPIRO
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Phone: (206) 623-7292
Fax: (206) 623-0594

Jason Thompson (pro hac vice forthcoming)
Ann K. Mandt (pro hac vice forthcoming)
CHARFOOS & CHRISTENSEN, P.C.
5510 Woodward Ave.
Detroit, MI 48202
Phone: (313) 875-8080
Fax: (313) 875-9857

Ronald Goldser (pro hac vice forthcoming)
ZIMMERMAN REED
651 Nicolette Mall, Ste. 501
Minneapolis, MN 55402
Phone: (612) 341-0400

*Attorneys for Plaintiffs and the Proposed Class*

-53-